```
                    UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF WISCONSIN
                         GREEN BAY DIVISION
-----------------------------------------------------------------
 UNITED STATES OF AMERICA,         )
                                   )
                    Plaintiff,     )  Case No. 19-CR-38
                                   )  Green Bay, Wisconsin
       vs.                         )
                                   )  July 29, 2019
 MICHAEL A. TALAMANCO,             )  1:34 p.m.
                                   )
                    Defendant.     )
                                   )
-----------------------------------------------------------------
```

## TRANSCRIPT OF SENTENCING HEARING
### BEFORE THE HONORABLE WILLIAM C. GRIESBACH
#### UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

 For the Plaintiff
 UNITED STATES OF AMERICA:      United States Department of
                                Justice
                                By: William J Roach
                                205 Doty St - Ste 301
                                Green Bay, WI 54301
                                Ph: 920-884-1066
                                Fax: 920-884-2997
                                william.j.roach@usdoj.gov
 For the Defendant
 MICHAEL A. TALAMANCO:          Brabazon Law Office LLC
 (Present)                      By: Shane Laughton Brabazon
                                221 Packerland Dr
                                Green Bay, WI 54303
                                Ph: 920-494-1106
                                Fax: 920-494-0501
                                Brabazonlaw@msn.com


 U.S. Probation Office:         Brian Koehler


 U.S. Official Transcriber:     SUSAN ARMBRUSTER, RPR, RMR
 Transcript Orders:             Susan_Armbruster@wied.uscourts.gov


Proceedings recorded by electronic recording,
transcript produced by computer aided transcription.

1          TRANSCRIPT OF PROCEEDINGS

2        Transcribed From Audio Recording

3              *     *     *

4          THE CLERK:  The Court calls Case No. 19-CR-38, United

5    States of America v. Michael A. Talamanco for sentencing.  May I

6    have the appearances, please.

7          MR. ROACH:  Good afternoon.  William Roach on behalf

8    of the Government.

9          MR. BRABAZON:  Good afternoon, Your Honor.  Attorney

10   Shane Brabazon with the defendant, Michael Talamanco.

11         PROBATION AGENT:  Good afternoon, Your Honor.  Brian

12   Koehler on behalf of Pretrial Services.

13         THE COURT:  Well, good afternoon, all.  Mr. Talamanco

14   is before the Court today for sentencing for attempting to

15   possess with intent to distribute Methamphetamine as charged.

16         The count would carry five to 40 years, but he is

17   safety valve eligible, and I understand he has taken advantage

18   of that so we're looking at a guideline range of somewhat less,

19   30 to 37 months.

20         In addition to the Presentence Report, I have

21   defendant's sentencing memorandum, and then a collection of

22   letters from family and friends of Mr. Talamanco.

23         Mr. Roach, is the Government in agreement with the

24   factual statements in the Presentence Report?

25         MR. ROACH:  Yes.

1          THE COURT:  And the guideline calculation?

2          MR. ROACH:  As well.

3          THE COURT:  Mr. Brabazon, have you gone over the

4    Presentence Report with your client?

5          MR. BRABAZON:  I have.

6          THE COURT:  Are there any objections to the factual

7    statements in the report?

8          MR. BRABAZON:  No, Your Honor.

9          THE COURT:  And are you in agreement with the

10   recommended guideline calculation?

11         MR. BRABAZON:  Yes, the guideline calculation as set

12   forth in the Revised Presentence Report is accurate.

13         THE COURT:  Okay.  Very well.  I will adopt the

14   factual statements in the Presentence Report as my findings of

15   fact.  I also adopt the guideline calculation, the Offense

16   Severity Score after reduction for acceptance of responsibility

17   and safety valve is 19.  His Criminal History Category is I.

18   That results in a sentence range under the guidelines of 30 to

19   37 months, two and a half to three years roughly, and that is

20   the starting point in the sentencing determination.  Mr. Roach,

21   I'll hear from the Government.

22         MR. ROACH:  Thank you.  The plea agreement calls for

23   the Government to recommend the guideline range sentence.

24   Absent safety valve, that obviously would have been a five-year

25   mandatory minimum term.

1    But with safety valve, the guideline drops to 30 to

2    37 months.  We believe that's a fair sentence range in this

3    case, and we'll advocate for such a sentence here of

4    imprisonment followed by four years of supervised release.

5    Factually, this case is not terribly complex.  It

6    started in January of this year 2019 when local postal

7    inspectors were advised from a California postal inspector that

8    a suspected dark web vendor, someone operating anonymously on

9    the Internet, was sending a package to Mr. Talamanco here in the

10    Eastern District of Wisconsin.

11    This dark web vendor was under suspicion of having

12    sent out packages, and this was such a package that was believed

13    to contain some form of controlled substance.  And indeed, it

14    did.

15    Investigator Derik Thieme, who is in court here today,

16    applied for a search warrant once that package came to this

17    jurisdiction and found that it contained over 100 grams of

18    methamphetamine, approximately, 118 grams I think it was.

19    And further investigation showed that there were,

20    approximately, 15 packages that had been sent from various

21    suspected dark web vendors to Mr. Talamanco in the months

22    leading up to this package in January of 2019.

23    So to continue the story, Investigator Thieme and

24    local investigators obtained a search warrant for the package,

25    saw that it contained methamphetamine, continued their

4

1     investigation and ultimately arrested Mr. Talamanco, also did a

2     search warrant on his residence.  When they did the search

3     warrant on the residence, they also located, approximately, a

4     half pound of marijuana, so a re-sellable amount of marijuana in

5     the residence.  They found some counterfeit currency that

6     through the investigation they later found is something that

7     likely was obtained via the dark web as well.

8             And then evidence of intent to sales, some scales,

9     some unused little gem packs, so small packages of plastic

10    containers that could be used to sell controlled substances, and

11    I think there's little doubt in this case --  There's no doubt

12    given the defendant's plead guilty, but there was little doubt

13    even before that plea that 118 grams of methamphetamine was

14    possessed with the intent to sell.  It's about a quarter pound

15    of methamphetamine.

16            Most often law enforcement here locally seize amounts

17    as small as 3.5 grams, sometimes even less.  But 3.5 grams is a

18    common amount that's sold on the streets here in Green Bay for,

19    approximately, $200.

20            So 3.5 grams is known as an eight ball or an eighth

21    once of methamphetamine street value, approximately, $200.  And

22    here the defendant had 118 grams, so very sizable amount of

23    methamphetamine, and indeed an amount that otherwise would

24    invoke mandatory minimum penalties.

25            And quite frankly if the substance was tested by a lab

1    as to purity, there's certainly the potential that if it was

2    significantly pure, 98-99 of a percent pure, it potentially

3    could reach into the 50-gram of mixture of substance category

4    that would invoke ten-year mandatory minimum penalties.

5            So we don't know that, but we certainly know that this

6    is a mixture and substance containing methamphetamine, and again

7    a re-sellable amount.

8            So as the case continues to unfold, we learn the

9    defendant had --  had some business difficulties, was in the

10   middle of a lawsuit involving a business deal that went wrong,

11   went bad.  The suspicion is the defendant wasn't making

12   significant enough income through the business ventures that

13   were in flux that he was turning to sales in order to probably

14   in combination support a habit and also obtain cash, obtain some

15   money for living expenses and such.

16           We learned when the defendant was ultimately charged

17   here through the bond study and as you know from the Presentence

18   Report, the defendant has a significant habit, approximately a

19   gram a day, so that's costly especially when income that had

20   previously covered your addiction, and the defendant had been

21   hiding his addiction.  Most of those around him didn't know

22   about it.  But when he's relying on himself to pay for

23   controlled substances for his own use, it's very, very common I

24   think as was happening in this case, you're selling controlled

25   substances as well to support your habit.  So that's a

1  significant habit the defendant has.  I think it's going to be

2  an issue of concern for the defendant in the future.  As you

3  know, the defendant was released in this case, and he's back in

4  custody because of that habit.  He relapses.  So once the

5  defendant was released on this federal charge, he started using

6  methamphetamine again, and the Court revoked his bond and

7  brought him back in custody.

8          So there's a significant controlled substance problem

9  the defendant has had.  You read in the Presentence Report

10  marijuana use dates back many, many years.  Methamphetamine was

11  nearly a daily substance of abuse by this defendant and

12  evidently had such a control over him that even while pending on

13  serious felony drug charges with mandatory prison time, he

14  returned to methamphetamine use.

15          So supervised release in this case is going to be an

16  important thing for this defendant to stay drug free and return

17  to a healthy environment.

18          The case as you know took a turn following the

19  defendant's plea in this case.  At the time of the plea, it

20  seemed that the defendant was going to serve the five year

21  mandatory minimum term.  He was not interested in sitting down

22  with the Government providing a safety valve interview because

23  it would require him to disclose sources of supply, and it would

24  require him to identify those that he was potentially selling

25  to, and that's fine.  That's not something that the defendant

1   has to do.  That's a decision he makes.

2          Quite frankly, I didn't think that was going to

3   happen.  He said some not so kind things about law enforcement

4   on jail calls and about the prospect of snitching.  It wasn't

5   something of any interest to him, but I think after thinking

6   about it for a while, that five year mandatory minimum term

7   didn't look so good and he eventually did sit down with law

8   enforcement and provided a safety valve interview.

9          Make no mistake about it though, this is not a safety

10  valve interview that will lead really to substantial assistance.

11  He told us about his purchases of crack cocaine and marijuana

12  and cocaine and methamphetamine through the dark web, but not at

13  a level and perhaps he didn't have those contacts but not at a

14  level where any prosecution will follow from that.

15         This is not helpful information that will make a case

16  in California or some other jurisdiction involving a dark web

17  vendor.  I'm not suggesting the defendant refused to disclose

18  that information.  It's just the anonymity of the dark web and

19  the type of contacts that he told us he had didn't lend to

20  person-to-person contact with someone under the dark web.

21         So he did sit down and describe how he obtained

22  controlled substances through the dark web, but it's not

23  something that will yield additional charges.

24         He did identify a couple of those in this area that he

25  had been supplying marijuana with and who he would have

1    conspired with to sell to get rid of --  to sell some of the

2    methamphetamine, again not something that will generate any law

3    enforcement interest at all.

4          So in some respects, Judge, I think the defendant is

5    fortunate, and he probably would tell you that as much as well

6    because he said during the safety valve interview that the

7    methamphetamine he was buying was so inexpensive.  It was about

8    $200 an ounce.  It's well more than $200 an once out on the

9    street.

10         The methamphetamine that he was purchasing on the

11    Internet was so in expensive that had law enforcement sat on

12    this investigation and watched him for another six months or

13    maybe a year, the defendant admitted during the safety valve

14    interview that he likely would have been up to maybe a pound

15    quantity, so much, much more substantial sales than and

16    purchases than a quarter pound here and would have had more of a

17    distribution network in place.  So he's fortunate.  We caught

18    Mr. Talamanco early and at a point where he's thus looking at a

19    lot less penalties and a lot less that can be done with the case

20    other than the prosecution of him and as opposed to a larger

21    conspiracy, and that's okay.

22         I don't want anyone --  We don't want anymore

23    destruction in the community at this point and this is enough,

24    this kind of destruction on Mr. Talamanco's family.  Obviously

25    in the Government's view, he should be going to prison here, so

1    this is enough.  And we're glad as well that this was something

2    that was caught early on.

3              So with all that being said, the Government believes

4    the guidelines have it right here, 30 to 37 months, somewhere

5    within that range is a fair and just sentence reflecting the

6    amount of methamphetamine, the poison here that was being

7    brought into this community by Mr. Talamanco.  That's a fair and

8    just term for him as well as a four-year period of supervised

9    release to follow.  Thank you.

10             THE COURT:  Mr. Roach, it's from almost all the cases

11   the meth is not homemade anymore, it's not locally manufactured.

12   It's coming from Mexico, and it's almost all pure.

13             I read earlier that if this amount 118 grams was

14   tested and found to be the typical purity that's around, this

15   would have been a ten-year mandatory minimum?

16             MR. ROACH:  Yes.  50 grams is the threshold assuming

17   that it's --  assuming that the statute uses the phrase actual

18   methamphetamine.

19             THE COURT:  Which is 95 percent or above?

20             MR. ROACH:  Yes.

21             THE COURT:  And does safety valve apply to that?

22             MR. ROACH:  Safety valve would have applied as well.

23             THE COURT:  What about now this was one of 15 packages

24   that were --

25             MR. ROACH:  Yes.

1          THE COURT:  The only one intercepted.  The other from

2     the same source.  We don't know if it was pot or meth or cocaine

3     other than your debriefing which isn't before me, right?

4          MR. ROACH:  That's true as well.  They were from

5     different sources, different vendors if you will.

6          THE COURT:  From the dark web?

7          MR. ROACH:  Pardon?

8          THE COURT:  On the dark web?

9          MR. ROACH:  Yes.  There were different dark web

10    vendors.

11         THE COURT:  So we don't know if it was counter to

12    currency.  It could have been any number of things.

13         MR. ROACH:  From the safety valve interview, we know

14    that it was what he said, marijuana, cocaine, crack cocaine and

15    meth.

16         THE COURT:  Okay.  All right.  Thank you.

17    Mr. Brabazon.

18         MR. BRABAZON:  Your Honor, one of my client's family

19    members, the stepfather, would like to address the Court.

20         THE COURT:  Sure.

21         MR. BRABAZON:  I wonder if this would be a good time

22    for that?

23         THE COURT:  That would be good.

24         MR. BRABAZON:  It would be Jerry Pagel who is here in

25    court.

1    THE COURT:  Okay.  The stepfather or father-in-law?

2    MR. BRABAZON:  Father-in-law.

3    MR. PAGEL:  Thank you, Your Honor, for giving me the

4  opportunity.  I have over the years addressed thousands of

5  people doing hundreds of interviews or presentations and have

6  spent countless hours testifying in courtrooms, but nothing has

7  prepared me for today.

8    When we found out about Mike's arrest, my wife and I

9  were devastated.  We were shocked.  We were angry, and we were

10  disappointed, disappointed in Mike's choices.

11    Having been in law enforcement for almost 40 years, I

12  have seen personally the devastation that drugs can do to

13  individuals and to families.  So what I have to say today, Your

14  Honor, comes from my heart, from the bottom of my heart and

15  something that I truly believe in and believe in Mike.

16    Yes, he did re-offend when he was released, but I

17  think he was not given the opportunities or the treatment

18  opportunities at that particular time, and I guess I am kind of

19  glad that he was re-incarcerated because I think now he has

20  weaned himself hopefully from the drugs that he was using.

21    He was not given that opportunity when he was

22  initially released to receive that treatment similar to the

23  individuals who were supplied methamphetamines during World War

24  II.  Not only the Germans but the Americans as well.  They were

25  sent back to the United States and a lot of those individuals,

1    those soldiers who had been supplied with the methamphetamine at

2    that time, also were not given the opportunity and treatment

3    that they should have received.

4            A lot of those individuals suffered years after they

5    were released or were discharged after World War II.  The

6    Americans were given the drugs Benzedrine, and the Germans

7    Pervitin, all narcotic type of individuals --  narcotic

8    substances.  They were given these drugs because they would be

9    able to stay awake longer periods of time, 24, 36 hours, and

10   they also -- Their fear level was decreased.  And Mike as well

11   was working long hours and probably shouldn't have been doing

12   what he was doing.

13           Granted, I truly agree that he has made some very poor

14   choices, choices that have gotten him into a lot of trouble.

15   But I also think that he now realizes that those choices were

16   very wrong.  Those were choices that not only affected him, but

17   affected his wife, his parents, his siblings and the many

18   friends who still support him, as you can tell by the number of

19   letters of support that you have received.

20           I find Mike to be a hard-working individual who takes

21   pride in his work.  I have spoken with several individuals in

22   the concrete business, and they indicate they would hire Mike

23   immediately because of his work ethic because of the fact that

24   he takes pride in the product that he produces.  And Mike was

25   also a caring individual.  He is not the antisocial individual

1    that many of us see in the criminal element.

2         And even while he was incarcerated here in the Brown

3    County Jail, he had that caring nature by allowing another

4    inmate who did not have the privileges on his calling card to

5    call somebody.  This individual wanted to call his mother, and

6    Mike felt sorry for this individual.  He's not the individual

7    who would say you want to call your mommy.  No, he is the type

8    of individual who allowed someone else to use his privileges,

9    Mike's privileges, to call his mother.  Mike later found out

10   that the jail rules don't allow this.  He now realizes that, you

11   know, you can't be doing that when you're in jail is giving

12   somebody else your privileges, but that's the type of individual

13   Mike is.  He is a caring individual, not the antisocial

14   individual who could have said no to that individual.

15        Mike is also now taking advantage of some healthier

16   and some constructive habits.  He's exercising.  He's lost

17   weight.  He's eating better, and he's also reading books and

18   novels, something he has never done before, so he's changing his

19   habits.  He's changing the way he's approaching things.

20        Before I became the sheriff of Calumet County, I was a

21   criminal investigator for better than 25 years and had

22   interviewed and interrogated hundreds of individuals, and I

23   think I was pretty good at determining the type of individual

24   that I was interviewing and interrogating.  Whether that

25   individual was the antisocial, career criminal, or he was just

1  someone who made a bad mistake and made a stupid mistake,

2  mistakes that got them in trouble.  And I think Mike falls into

3  this later category.  I don't believe that he is the career

4  criminal that is going to continue these activities.

5         I strongly feel that a sentence imposed and stayed

6  would do great wonders for Mike.  He would know the consequences

7  that he was facing if he did not abide by the laws and the rules

8  that were before him, and he could also continue to be a

9  productive member of society.  As I indicated, he does good work

10 as a concrete construction worker, someone who individuals look

11 up to.  And I think he could continue to be that constructive,

12 productive individual in society.

13         And like a lost sheep, I would be his shepherd.  I

14 would make sure that he did not wonder far away from the rules

15 set before him.  And I strongly also feel that if this was a

16 state charge, Mike would probably be looking at probation with

17 maybe some months in jail.  He has --  He and Holly, his wife,

18 have a beautiful house on ten acres of land with an L-shaped

19 pond stocked with fish.  Holly is now working three jobs to try

20 to make sure that they do not lose that house, that property.

21 But she -- Since Mike has been incarcerated, she has learned

22 that she's going to need foot surgery, which is going to

23 probably require her to be off of two of these jobs as

24 waitresses --  waitressing for four to five weeks, which is

25 going to put a financial strain on them keeping that piece of

1    property that both Mike and Holly love.

2          As you can tell from the number of letters that you

3    received that Mike does have a lot of support, people who truly

4    do believe in him, people who know Mike personally and know what

5    type of person he really is.  And again I wouldn't be saying

6    these things if I truly also did not believe in Mike changing

7    his ways of life, the way he has done things in the past, and

8    I'm a believer in giving individuals a second chance.

9          A judicial friend of mine once told me, Jerry, if you

10   give an individual a second chance, you're going to find out

11   what type of individual that is.  If he's the career criminal,

12   he's going to hang himself.  And if he has remorse, he's going

13   to change his lifestyle.  And I think giving Mike that second

14   chance, you're going to find out that he's going to change that

15   lifestyle.

16         So I just want to say thank you for allowing me the

17   opportunity to address the Court today.

18         THE COURT:  All right.  Thank you, Mr. Pagel.

19   Mr. Talamanco --  Go ahead, Mr. Brabazon.  I read your

20   sentencing memorandum, but I'm sure you have more to tell me.

21         MR. BRABAZON:  Just a little bit, Judge.  I think the

22   focus of my sentencing memorandum was really the nature of the

23   offense and trying to show the Court that everything that

24   Mr. Talamanco had told me about this offense was I believe

25   corroborated when he had the debriefing and provided his

1  password to his phone.

2         Mr. Talamanco first and foremost is a drug user.  He

3  has a history of ADHD, and has used different types of drugs

4  throughout his life to self medicate and started using

5  methamphetamine I think it was around three years ago, and it

6  has become a daily habit.  It is what has provided him with the

7  focus and alertness to not just function but to take on and

8  create his own business and work the hours he worked.

9         There were some and admittedly there were some

10  marijuana sales to friends.  He wasn't hanging out on the street

11  corners or trying to create a business for himself.  He was hard

12  working.  For the last almost year, he was owning his own

13  business.  So the sale of marijuana was not something that drove

14  him or provided for his family.

15         When the drugs were ordered in talking to

16  Mr. Talamanco and through the debriefing, it seems so unreal

17  that you can get a quarter pound of meth for $800.  The whole

18  process of Mike's endeavors into the dark web was a hose in the

19  water type of mentality.  He bought paraphernalia.  He bought

20  small quantities of cocaine, and there was a learning process

21  for him.

22         He admitted he had been robbed a couple times meaning

23  sent money and never got anything in return.  So I think when he

24  pushed that button to order that, I think you can back his time,

25  there were some doubts whether or not he would get that

1   methamphetamine.  But it was his goal to get it.  It was no

2   doubt about it, he wanted to get it.  But I think that the

3   information that's on his phone corroborates that he wasn't

4   actively dealing methamphetamine, but he was honest.  When I saw

5   a quarter of a pound, it went through my mind immediately, wow,

6   maybe I can make some money doing this.  But the phone records

7   don't show any type of communication saying hey, I got this

8   methamphetamine coming, can you help me sell it?  There was one

9   communication from several months earlier that he had sent to

10  somebody asking if they might be interested or be able to sell

11  some.  Other than that, that's all that's out there as far as

12  distribution of meth.

13         And I think the information supports the fact that

14  what makes what he says correct is if this is something you guys

15  can come here, four, six, months or 12 months down the road,

16  there could have been a more structure --  some structure in

17  place.  I may have had significant sales, but there's nothing in

18  his phone corroborating that.

19         But he admits when he purchased it, he immediately had

20  the thought, I might be able to sell some and make some money.

21  But first and foremost, he was using a gram a day.  That's how

22  he medicated himself.  That's how he overcame the ADHD and

23  allowed him the ability to focus and be mentally alert and build

24  a successful business.

25         That's I think the most important aspect of our

18

1    sentencing memorandum is to explain to the Court this is not

2    your typical case where Mr. Talamanco had some sophisticated

3    network and was involved in the distribution of drugs for

4    methamphetamine for three or four months and was caught long

5    after the fact.  This was the very infant stages of

6    Mr. Talamanco's distribution of methamphetamine.

7            So I want the Court to appreciate and understand that.

8    Certainly there has to be punishment.  Certainly there has to be

9    rehabilitation.  I want to focus most of my discussions on

10   Mr. Talamanco's need for rehabilitation.

11           The Presentence Report is certainly thorough and

12   provides the Court I think a wealth of information about

13   Mr. Talamanco's background.

14           With respect to his drug use, Mr. Talamanco's drug use

15   goes back to teenage years.  And one thing you can glean from

16   that is we've learned that Mr. Talamanco has shown the ability

17   to rehabilitate.  He was on heroin.  He had a serious heroin

18   addiction.  And when a friend of his died, he almost died, that

19   was the impetus for him to stop using heroin, which from my

20   understanding is one of if not the most addictive drugs, the

21   most difficult to get off.  Mr. Talamanco was able to do that.

22           It's not in the Presentence Report, but he also

23   stopped using nicotine, stopped smoking, so he has the ability

24   to deal with his addiction.  I think that's an important aspect

25   of his background.

1        Mr. Talamanco also has held down a job for many years,

2   a hard-working individual and became an entrepreneur in starting

3   his own business.  I think Mr. Talamanco, unlike many

4   individuals that come before this Court for these types of

5   charges, is a very goal-oriented person.  He is not using the

6   methamphetamine to get high.  He's using it to cope and deal

7   with his ADHD.

8        He says I think in his Presentence Report, I know

9   drugs aren't cool.  He's not doing it to be cool.  He's not

10  doing it to get high.  I think it's corroborated by the fact

11  that all these people behind him, behind me, his family and

12  friends are all intelligent people.  They had no idea he was

13  using.  And if he was using it to get high, I would suggest that

14  they would know he was using it to get high.  But I think it

15  corroborates what Mike has been telling me all along.  I was

16  using it to deal with my ADHD, and it allowed me to work.  I

17  didn't miss work.  I wasn't depressed.  I wasn't laying on the

18  couch.  I wasn't having problems with alertness.

19       I think it corroborates the fact he was --  had a

20  benefit from the use of it that people who don't have ADHD

21  probably don't derive that benefit.  They probably go for the

22  high.  That's not how it affected Mr. Talamanco.

23       Mr. Talamanco is not a sophisticated drug dealer.  I

24  think the phone records corroborate he didn't have any type of

25  sophisticated network in place.

1    There's a lot of people, Judge, that don't have --

2   that come before this Court and across the street in state court

3   who for these types of offenses are not motivated people.

4   People sit in jail.  To them, it's just fine.  90 days is

5   90 days.  That's not the way Mr. Talamanco looks at this at all.

6    Every day that he has been in jail for him, he has

7   seen that as a loss, as an opportunity lost of not being able to

8   work, not being there for his wife, not being there for the

9   family gatherings.  Every day that he spends in jail for him is

10  not just a day in jail, it's another painful memory of his poor

11  decisions.

12    Another thing that has been important over this period

13  of time he's been in jail, which I think now is 101 days not

14  including today, and he had ten days before his first release,

15  Mr. Talamanco does not have the typical sunken face that serious

16  meth users have had.  He doesn't have decrepit teeth that people

17  sometimes have with meth use or the face that has been poked at

18  hundreds of times, and you can see it in the way.  He doesn't

19  fit the profile of those faces of meth that we see on the

20  Internet or in the judicial seminars or law seminars.

21    But now that he has been in jail for these 101 days,

22  he has seen those things.  He's seen people come in and out of

23  the jail.  He's seen the devastation it has had on most

24  individuals.  He's seen the devastation it has had on those

25  families, their inability to work, their inability to function,

1  the health issues that are prevalent in those individuals, so I

2  think it's given him an opportunity to see how damaging meth is

3  in our community.

4       I don't think considering how it has affected him, I

5  don't think he was privy to that understanding and that depth of

6  how prevalent meth is in our community.

7       Mike was able to overcome the heroin addiction.  He

8  did it because there were dire consequences that he visibly saw.

9  Back in February, I don't think Mike saw those consequences,

10  Judge.  I think he saw meth as a tool to still deal with his

11  depression and ADHD.  He needed it to cope.  I think now he

12  really understands and appreciates the impact that meth has on

13  him and the community.

14       I think that Mike is an excellent candidate for

15  treatment.  I think given his experience with drug addition, I

16  think Mike probably focuses --  would do best in kind of a

17  one-on-one setting than a group setting.  I know the Court has

18  no control over that, but I think that Mike has the tools

19  already to assist him in dealing with this addiction of

20  methamphetamine.  I think if he's on the right medication to

21  deal with his ADHD and depression, I don't think he needs meth,

22  and I think he can live without it.

23       But most importantly is he knows that it's ultimately

24  his decision, and I think he knows that if he has the ability to

25  treat his ADHD with medication, I don't see any reason why he

1  would go back to using meth.

2          He has had the real world implication and consequence

3  for his meth use, and I think that's what's going to motivate

4  Mr. Talamanco for ever being here again is the idea of the

5  opportunity lost, the loss that he has and the effect it has had

6  on these people.  I know he's disappointed at the fact he's

7  disappointed those people behind him.

8          I know it was difficult for him to tell his wife about

9  his addiction and tell him the depth of what he was doing.  I

10 think that means a lot that Mr. Talamanco doesn't want to let

11 those people down behind him ever again.

12         It's with those reasons, Judge, that we are asking the

13 Court to follow those recommended in our sentencing memorandum.

14 I don't believe this is your typical case of a person attempting

15 to buy drugs for distribution.  Clearly, I think there's going

16 to be some drugs distributed here, Judge, the quantity would

17 certainly judge that.  But I think realistically speaking, most

18 of those drugs would probably be ingested by Mr. Talamanco over

19 the next month or two months or three months.

20         The only --  I don't know what the Court does as far

21 as a sentence goes.  If the Court does determine that a

22 lengthier time of imprisonment is necessary, we would ask the

23 Court to consider the drug treatment program.  I think it would

24 be appropriate for Mr. Talamanco.  This was the case, Your

25 Honor, where my client did qualify for the safety valve as

1    Mr. Roach pointed out.  It really didn't involve giving any

2    information about anybody that was going to lead to any type of

3    Government activity or indictments or anything of that nature,

4    but I think it was useful information.  There was discussion

5    about the type of packaging, how it was packaged.  I think it's

6    information that the postal service and inspectors could use for

7    furthering other investigations.

8            And I know that Mr. Talamanco is extremely concerned

9    about the safety valve and how it's going to be looked upon once

10   he's in the prison system.  He's gravely concerned that it's

11   going to be a negative, be looked as though he's narking on

12   other individuals.  He's been apprised by people that have been

13   in the federal system that have suggested that you will be

14   physically harmed if they know that you were found eligible for

15   the safety valve.

16           I advised Mr. Talamanco we can't --  we can't not

17   check the box so to speak on the judgment of conviction, but I

18   would ask the Court if the Court would be willing to either on

19   the minute sheet or the judgment of conviction provide some type

20   of a phrase similar to although he did not provide any

21   incriminating information pertaining to other individuals,

22   Mr. Talamanco does qualify for the safety valve, something that

23   he would have in his arsenal that can say I didn't narc.  I have

24   a safety valve.  I'm not a person that narked on somebody.

25           That's a huge consideration.  I think ultimately he --

1    that was the biggest obstacle in overcoming with Mr. Talamanco

2    to have him decide to do the safety valve was his concern for

3    his safety when he's put into a prison system having a safety

4    valve label put on him.  Ultimately, he did obviously provide

5    information.  But if the Court can, at least, consider that type

6    of a comment in the minute sheet, we would certainly appreciate

7    it.

8            THE COURT:  Mr. Roach, I've not heard safety valve as

9    an indication that somebody is in danger, substantial

10   assistance, yes.

11           MR. ROACH:  Downward departure motions --

12           THE COURT:  But safety valve is almost -- If anyone's

13   got a first offense, they almost know how to always get it, and

14   I think we can include it in the judgment a statement next to

15   checking the safety valve that that's required.  If it's not

16   required, we won't do that.  But if that's required, we can

17   indicate no substantial assistance was provided.  That's an

18   accurate statement?

19           MR. ROACH:  Yes.

20           THE COURT:  That should alleviate any concerns he has

21   in that regard.  My impression of the federal prisons or, you

22   know, I think it's --  they are safer and better run than states

23   for the most part.  Let's move on.  Mr. Talamanco, is there

24   anything you would like to say?

25           DEFENDANT:  Yeah, I have a little speech.  A lot of it

1   was touched upon already.  But first off, I want to apologize

2   for my crime.  Being incarcerated, I've seen the negative

3   effects first hand that meth has on people in the community.

4        There are a couple things I'd like for you to know and

5   understand about me when considering my sentence.  I am an

6   addict.  I truly understand my addiction issues.  I have been

7   through plenty of treatment in my life.  I have learned the

8   tools that help me with my recovery.

9        I also want you to understand I've quit two of the

10  most addictive substances to man, heroin and smoking.  I have

11  learned through the years of treatment what it takes.  I know I

12  can quit meth.  I have the tools they teach in recovery.  And I

13  know what you're thinking.  Well, you did not use these tools

14  when you were out on bond.  That is exactly right.  I did not

15  use the most important one, which was wanting to quit.

16       After 100 plus days of sobriety, I feel better than I

17  have in a long time given the circumstances.  I know with the

18  support of my family and friends and a little help from the

19  right anti-depressant and most importantly a plan of what to do

20  with my free time that I was using -- spent using, I will be

21  able to quit.

22       Another thing I would like you to take into

23  consideration when deciding the fate of my future is the

24  consequences I have already dealt with because of my actions.  I

25  have had to sell my truck and other equipment to pay for

1    attorney costs and to keep making payments on my house.  I have

2    lost over $100,000 in equipment that has been repossessed

3    because I cannot make payments while I'm sitting in a jail cell.

4    I have lost employees and contractors.  These are things that I

5    will have a chance to recoup without a long sentence.

6         Second and most importantly, my actions have lead to

7    lost time I have had with my family and their trust.  I have not

8    been able to hold my wife's hand, hug my father, mother, push

9    around my nephew for the last three months.  When it comes to

10   lost income and financial losses I have had to deal with, that

11   means nothing compared to the time I lost with my family.

12        These are hours, days, weeks and months that I'm never

13   going to get back.  Please do not make them years that I lose

14   with them.  I fully understand I should be punished for my

15   actions.  But what more do I need to lose to make this right?  A

16   prison sentence will do no one any good.  Being in a

17   drug-infested prison will certainly not help with my sobriety.

18   Making our community pay for my incarceration while I could be

19   back there being a productive member of society, paying taxes,

20   employing people that need to go to work every day.

21        If I am incarcerated for any great length of time, my

22   company will fall apart.  I will have to sell the rest of my

23   equipment in order to make house payments.  I know --  I also

24   know there's great consequences I will be faced as being a

25   convicted felon, losing the right to vote and bear arms.  If I

27

1  lose my company, it will not be easy for me to get a job being a

2  felon.  I realize I have to pay for my actions the rest of my

3  life even without going to prison.

4          If the criminal justice system wants an eye for an

5  eye, they have already taken both.  With all this being said,

6  whatever you decide happens to me after today ultimately what

7  happens to me for the rest of my life is up to me.  And what I

8  have lost and will lose because of my bad choices I have made

9  are nothing compared to the loses I would suffer if I continued

10 on the path I was headed.

11         THE COURT:  All right.  Thank you, Mr. Talamanco.  In

12 making a sentencing determination, the case law and statutes

13 require that I begin with consideration of the guideline range.

14 And as I said here, the guideline is 30 to 37 months.

15         Not that long ago, those guidelines were mandatory.  I

16 had very little discretion in deviating from them.  That's no

17 longer the case.  And while I must consider the guidelines, the

18 ultimate goal of sentencing is to arrive at a just and fair

19 sentence determined by consideration of two major factors.  The

20 first of which is the nature and circumstances of events.  Why

21 are you here?  What did you do?  What's the crime?

22         The other major factor though is the history and

23 character of the defendant.  Who is it that committed this

24 crime?  What is his degree of culpability?  What is his whole

25 life like?  And then I use those two factors, the nature and

1    circumstances of the offense and then the history and character

2    of the defendant, to fashion a sentence that meets certain

3    goals.

4            The first of which is to impose just punishment for

5    the offense.  Just punishment is punishment that reflects the

6    seriousness of the offense, and it promotes respect for the law.

7    It's hard to determine --  You know, it's not like I have a

8    measuring rod.  You put in these factors, and I get the right

9    sentence.  It's not like a calculator.  It's a question of

10   judgment, and it's a judgment based upon the nature and

11   circumstances of the offense primarily, and you want a sentence

12   to be proportional to the seriousness of the offense.

13           Jay walking, we don't put people in jail for that.

14   Murder, obviously.  And between it's almost --  You know,

15   there's a lot of other things.  Drug dealing is a serious

16   offense, and especially a drug that's as dangerous as meth.

17           You argued and your attorney argues it wasn't as

18   dangerous to you, but it is a drug that we saw an awful lot of

19   as a scourge.  Let me go through the other factors though that

20   I'm to consider.

21           The first as I said is the need for punishment.  The

22   second major purpose of sentencing is the need for deterrence.

23   That means sending a message to you, but also to the larger

24   community that this behavior cannot be tolerated.  This is

25   wrong.  This has an impact on the community, and we need to tell

1  people by the manner in which we sentence the crime how they

2  should avoid it.  And it's especially important in cases where

3  the motivation for crime might be monetary.  I think I can make

4  a lot of money doing this.  If you want to send the message to

5  the larger community that it's not worth the risk, you may think

6  you're going to make a lot of money, but in the long run it

7  doesn't pay, so that's the deterrence.

8           Another purpose of sentencing is to protect the public

9  from further crimes of the defendant, make sure he doesn't

10 continue on the same road and cause, you know, havoc, ruin

11 lives, his own and others, those around him.  Especially that's

12 important with violent offenders, but it's important with drugs

13 too because drugs are often associated with violence and

14 sometimes worse than violence, the breakdown of families, the

15 failure of fathers and mothers to fulfill their obligations to

16 their children.  It would almost be better to slap your kid in

17 the face than abandon them so you can go use drugs, and yet

18 that's all over the place.  People are not fulfilling their

19 responsibilities to their employer, to their families, to their

20 children because they're out --  they have enslaved themselves

21 to a drug.

22          This is a drug that we see more and more of.  It's so

23 readily available in such a purity now without the health

24 effects that Mr. Brabazon talked about.  It is a real scourge.

25          The last purpose of sentencing is to provide

1    rehabilitation opportunities for the defendant, so those are the

2    factors I consider.

3        Now turning first to the nature and circumstances of

4    this offense.  Drug dealing as I said is a serious offense.  I

5    recognize and I will consider the fact that you were not yet

6    lucky --  and you are lucky you were caught.  The earlier you're

7    caught, the better off you are.  It's counterintuitive.  And

8    frankly, I think your father-in-law is right, too.  You're lucky

9    you went to jail.  I'm not sure you would have this attitude if

10   you hadn't spent the last 100 days or so or whatever in jail.

11   You didn't have that attitude early on.  That's clear.  And

12   maybe seeing what others did to themselves, but also freeing

13   yourself and clearing your mind I hope has given you some

14   insight into yourself into what this has done to you.  You're

15   not the first person.

16       In fact, it's very common for me to see people that

17   and especially with, you know, this goes to alcohol addiction,

18   too.  People off the reservation who will say at the time of

19   sentencing now having sat for maybe, you know, several months,

20   they'll tell me this is the longest they've been sober since

21   they were kids.

22       And after reading a Presentence Report and a

23   Presentence Report is really --  it's the story of your life.  I

24   mean not the whole life, but the story of not only your offense

25   but also your criminal history and your upbringing and whatever

1    you've made of, you know, your education and your family.

2    That's what I see.  That's what you read.  And people come

3    before me after now that they're sober and they see clearly and

4    having taken stock of their own lives, and it's not unusual to

5    see grown men cry and feel shame for what they've done.

6         And people say --  People on the outside say, well,

7    he's just pretending for sentencing.  I don't believe that.  I

8    don't think grown men can cry unless it's sincere.  I just don't

9    see that.  I think they are sincere.  The key thing is whether

10   that resolve and that attitude will continue past sentencing,

11   past the sentence.

12        But this is a serious offense.  You could tell from my

13   questions to Mr. Roach were about the amount of the drug and the

14   nature of the drug.  And even, you know, we talk about the

15   effect it has on others.  I've talked about that.  But the other

16   side of this equation is who are you giving all this money to?

17   Who is producing all this?  We now know that it's these drug

18   cartels in Mexico that have destroyed families and destroyed a

19   whole culture.  They are ruining things.  Some of these places,

20   California and the west coast, there's so much of this that it

21   is destroying civilization.  That's not your intent I recognize

22   that, but keep in mind that's what's going on here.  We're

23   supporting that stuff.  Those people that use the stuff, that

24   buy it, that distribute it are not just ruining the lives that

25   they sell to, but they're also ruining the lives that people

1  that have to live in communities in which the cartels operate,

2  and they're ruthless.

3         But the purity here, too.  I hope your statement if

4  the Government wants a pound of flesh or an eye for an eye,

5  nobody wants an eye for an eye.  Mr. Roach has shown frankly

6  quite a bit of moderation.  He's not trying to get another notch

7  in his belt; otherwise, he would have had this stuff tested and

8  had you looking at a 10 year; otherwise, he would have come up

9  with a way of calculating the amount of drugs in the 15 packages

10  that weren't intercepted.

11         So I hope you don't feel that you've been abused.  You

12  have not been by the Government.  The Government has shown

13  moderation, and these are laws that were passed by Congress and

14  many people --  There are plenty you can argue about.

15         I listened closely to your father-in-law's description

16  of people given the stuff in World War II, and I don't know that

17  history, and I don't know if it's accurate or not.  If it was,

18  this is a different time and a different place, and you were not

19  in war.  And you certainly understood that these were serious

20  crimes.  This is a serious drug.  There's not much talk about

21  legalizing meth that I hear marijuana's argued about a lot.  But

22  meth, I think people see the damage that meth has done, and most

23  are real concerned about what it's doing to the community.

24         But this is as I said a serious crime, and I look at

25  your history and your character, and it's mixed.  On the whole,

1    I mean when I get this many letters, I'm impressed.  I hope and

2    this is another thing that comes unfortunately with sentencing.

3    You get to see what others, friends and family, really think

4    about you.  Usually you don't hear this stuff until you're dead,

5    and then you don't hear it because you're not there to hear it.

6    But obviously, you have touched many people.  You have qualities

7    and character that have impressed a lot of people.  And even

8    this lie you lived, and this was a lie hiding this from

9    everybody.  Even that is not enough to change their minds about

10   what they know better than that.  They know the real you.  They

11   know the you, the person that's skilled, that's hard working

12   that loves work, takes pride in work but also takes pride in

13   giving of himself and sharing and showing little kids how to

14   fish, playing games with them and building a beautiful home that

15   he can share with his wife, with her family and his family and

16   nephews and nieces.

17        What a wonderful thing, and it's all in jeopardy

18   because of these choices you made.  So on the one hand, there's

19   certainly those wonderful, positive qualities.

20        On the other hand, why would you do this?  Why would

21   you jeopardize all that?  Now, I recognize we talk of drug

22   addiction, oh, it's a disease, it's a disease.  You know, it's

23   not like a cancer.  I mean you beat it.  You stopped.  You've

24   been through treatment.  You had Hazelton.  You had the best

25   treatment I hear about.  Your parents put you through that when

1    you were just a teenager, a little older.

2            So, obviously, I'm --  Correct me if I'm wrong, but

3    you could probably teach a treatment course.  You know what they

4    teach.  It's not a question of, you know, getting away from the

5    stuff, and I think this is one of the dangers that sometimes

6    comes into people's minds.  They excuse their behavior because I

7    didn't have treatment.  I need more treatment.  But don't let

8    that be an excuse.  You know you're capable.  You're a human

9    being.  The wonderful thing about human beings is you can say

10   I'm smarter than this.  I know what this does, and I don't care

11   how much --  I maybe very much want to use it today, but the

12   longer I stay away from it, the better off I am.  I know that.

13   And I know what I want in life, and I don't want to end up in a

14   jail cell, and I want to be out caring for my family and doing

15   the work I love and making a real contribution.

16           So I'm not, you know, opposed to treatment.  We want

17   to give people treatment to help themselves, but it's not like a

18   pill.  It's not like setting your leg and nature takes over and

19   it gross back together.  This is an act of will.  It's resolve.

20   It's a decision.  I'm done with this.  I know better than this.

21   And I guess what's upsetting here is that you went through this

22   as a teenager.  And, you know, we're used to kids making stupid

23   mistakes.  And you made a lot of them.  You know, it's

24   understandable that kids make stupid mistakes because they are

25   kids.  They don't have really good judgment especially in a

1  culture that's now surrounding kids with bad messages.  And

2  especially if you're having other problems because of what it's

3  ADHD or, you know, family breakup.  All kinds of things can

4  impact.  I recognize that.  But you did this as a kid.  Even the

5  heroin, and you stopped.  And then you built this wonderful work

6  history, and you find yourself back in it at age 38 after you

7  have a wonderful marriage.  I'm thinking what the heck happened?

8  How did you get back into this?

9         This was --  you know, this was --  You knew better

10 than this.  And in one sense, you know, there's a lot of

11 qualities that tell me, okay, this is a good person.  But in

12 another sense the fact that you went back into that when you

13 should have known better, and you did know better.  And when you

14 had so many other positives.  It makes it more culpable.  You're

15 not a kid anymore.  You should have known better.

16        But I look at all these things together, and of course

17 I need to impose a sentence that's going to impose just

18 punishment that's deterrent, that will provide some deterrence.

19 I don't regard protection of the public as a big factor here

20 because I think the main thing we want to protect the public

21 from is your going back in this direction, and I think you're

22 not likely to.  And I think I can prevent that with supervision

23 if it's any likelihood.

24        And although I think the Government's argument is a

25 strong one for a guideline sentence here, I'm frankly going to

36

1  go with your attorney's recommendation.  I'm going to order a

2  sentence for a year.  I'm going to add custody --  I mean

3  supervised release of five years, and I'm going very low on

4  custody.  And part of the reason is, you can tell from my

5  comments, I recognize this is not a drug -- You know, you were

6  caught early.  I don't think from what I can tell, I could be

7  wrong, but I don't sentence on hunches.  I try to sentence on

8  the facts and the facts seem to be not really in dispute that

9  you did not become a major dealer, that this was primarily self

10 medication and abuse by yourself.

11         So I'm thinking that's a big factor.  Now, the

12 deterrence value I worry about because people that are looking

13 to make money and see that you can buy this stuff on the dark

14 web for $200 and sell it for $800 or whatever, that is a strong

15 incentive, and I worry that a sentence of only a year for this

16 kind of crime sends the wrong message.  But, you know, I can't

17 --  I try to --  I'm more interested in trying to accomplish

18 those other goals of imposing a just sentence and providing an

19 opportunity for you to rehabilitate.

20         The other thing is in terms of protection of the

21 public, I'm satisfied with five years of supervised release, and

22 it's federal supervised release.  Our federal agents,

23 Mr. Koehler's colleagues, will be testing you.  We're going to

24 do random drug tests.  I think you have a father-in-law that

25 will be interested in this as well.  But even without him, we're

1  going to be testing you randomly. You show up positive, guess

2  what? You come back here before me. I can reread this

3  presentence. I can listen to what we've talked about today.

4  And if I've made a mistake, I can correct it.

5         Now, I hope I haven't made a mistake, and it seems to

6  me that there's every reason -- positive qualities I see here

7  seem to indicate that this is not a risk, that you've learned

8  your lesson, that you will never make a mistake like this, that

9  you'll never --  you'll stay away from this poison. If you need

10  medication, fine, go to a doctor, but do not get involved in

11  drugs again or any other criminal conduct.

12         Your record shows that you had --  and the argument

13  give him a second chance. You know from your prior record, you

14  were put on probation two or three times, so you've had --

15  probation is your chance, so you've had three or four chances,

16  really. They were a long time ago. But at this age, it's not a

17  question of a second chance. I don't regard this as so much a

18  second chance as this is an effort to meet where you are now and

19  use the positives here and impose a sentence that's I hope

20  sufficient, I believe sufficient, certainly not greater than

21  necessary to accomplish those important goals of setting --  of

22  imposing a just sentence and one that will have a deterrent

23  effect.

24         So I'm also as I said imposing a sentence or adding

25  five years of supervised release, and it's more than the minimum

1    four years.  It's not much more.  It can be increased if I need
2    to.  And of course if you come back before me and you're using
3    or doing anything that's pretty severe, I can revoke you and add
4    supervision later, too.  But I'm going to --  I think the extra
5    year makes sense given the history of the drug usage here, the
6    extent of the problem, and also the fact that I'm going somewhat
7    lighter than certainly many would argue is reasonable in terms
8    of the term of incarceration.

9          I don't know if this allows you to hang on to your
10   business.  You know, I hope it does.  But even if it doesn't,
11   you have work skills.  You can build it back up.  Had you not
12   been caught, it might have been a loss of your life rather than
13   your business.  And as long as you have that attitude and those
14   skills and you keep your health, you should be able to be fine.
15   You should be able to do well.  I hope you can hang on to this
16   beautiful property, but this again, these are things, you know,
17   that are in jeopardy because of decisions you made.  You should
18   have known better, and you're adult enough to know better.  And
19   whether you like these laws or not, as a citizen of this
20   country, you have an obligation to obey the law, and it's not
21   that these were flippantly passed in order to harm people.

22         Frankly, there's been just too much --  too many of us
23   have watched what drugs have done to people, and Congress has
24   reacted in this fashion.  Certainly we can argue about the
25   length of sentences, but I hope you see why these things are

1    prohibited.  And whether you agree with it or not though, you're

2    going have to stay away from this stuff in the future.

3          Okay.  I also ordered $100 special assessment.  Now,

4    the conditions of supervision I'll go over as part of the

5    pronouncement of sentence, because I want to emphasize them.

6    There's some that are mandatory that come with every crime, and

7    that's you're not to commit any federal, state or local crime;

8    you're not to possess a firearm, and in fact, you're prohibited

9    from possession of a firearm with a felony conviction.  That

10   doesn't mean you can't fish, though.  You can still fish.

11         You're not to illegally or use a controlled substance.

12   You're to report to your probation office in the district in

13   which you're released within 72 hours of your release from the

14   custody of the Bureau of Prisons, and you have to report to your

15   probation officer in a manner and frequency as reasonably

16   directed by the Court or your probation officer.

17         Now, the Bureau of Prisons will calculate the credit.

18   I just give a year.  I'll make this a year and a day.  I'm going

19   to add a day, frankly, because that will give you credit and

20   allow you a reduction for good time.  They'll give you credit

21   for your time spent in custody, so I don't know what the outcome

22   will be, but Bureau of Prisons will give you dates on that.

23         You may not receive credit for time you spent in state

24   custody.  I don't know if that amounted to anything, but that

25   will not be calculated by the federal government, and you're not

1    entitled to it under federal law, and I recognize that.

2         You're not to leave the State of Wisconsin without the

3    permission of the Court or your probation officer.  That doesn't

4    mean you can't leave.  You just got to let your agent know why

5    and where you want to go and get his permission.  It's

6    frequently granted if it's like a vacation or, you know, going

7    to see family.  I know you have family in Arizona.  Your nieces

8    probably want to see you, and no one is going to prevent you

9    from doing that, but you have to comply with the rules.

10        You are to answer truthfully all inquiries put to you

11   by your probation officer subject to your Fifth Amendment right

12   against self incrimination, and you are to follow the reasonable

13   instructions of your probation officer.

14        You are to use your best efforts to find and hold

15   lawful employment unless you're excused by your probation

16   officer for schooling, training or other acceptable reasons.

17        You are to notify your agent at least ten days prior

18   to any change in your place of residence, your place of

19   employment.  If such prenotification is not possible, you are to

20   notify your agent within 72 hours after the change.

21        You're not to knowingly go to places or enter

22   buildings where controlled substances are in lawful use, sold,

23   distributed or administered.

24        You're not to associate with any persons known by you

25   to be engaged in or planning to be engaged in criminal activity.

1    Associate as used here means you're not to live with them or to

2    regularly socialize with such person.  In other words, stay away

3    from drug users and dealers.

4            You are to permit your agent to visit you at

5    reasonable times at home and permit confiscation of any

6    contraband that is observed in plain view by your agent.

7            You are to notify your agent within 72 hours of your

8    being arrested or questioned by a law enforcement officer even

9    if nothing happens other than you're pulled over for a traffic

10   ticket.  Let your agent know within 72 hours.

11           You're not to enter into any agreement to act as an

12   informant or a special agent of law enforcement without the

13   permission of the Court.

14           You must participate in a program of testing, which

15   will include not more than six urinalysis tests per month and

16   residential or out-patient treatment for drug and alcohol abuse

17   as approved by your agent until such time as you're released

18   from the program.

19           You have to pay the cost of that program under the

20   guidance and supervision of your agent, and you are to refrain

21   from alcoholic beverages throughout this supervision --  your

22   period of supervised release.  I'm going to --  You know

23   alcohol, I don't see an alcohol problem here.  I know a lot of

24   controlled substance treatment says no alcohol because they

25   don't want to see it substitute.  I'm going to make this do not

1  drink excessively.  And by excessively, I mean in Wisconsin if

2  you go to a picnic, you might have a beer.  I don't want that to

3  be a violation.  On the other hand, don't just substitute one

4  drug for another.  And do not drink to excess.  I don't see a

5  history of that, so I'm going to eliminate the no alcohol

6  provision.  But your agent can recommend it if your treatment

7  provider thinks it's needed or if you show evidence of that.

8         And lastly, you are to submit your person, property,

9  house, residence, vehicle, office, papers computers, other

10  electronic communications or data storage devises or media to a

11  search conducted by your agent.  Failure to submit to the search

12  may be grounds for revocation of release.  You are to warn any

13  other occupants that the premises could be subject to searches

14  pursuant to that condition.  The officer can conduct the search

15  pursuant to the condition, however, only when there's reasonable

16  suspicion to believe you violated a condition of your release,

17  and the area to be searched may contain evidence of the

18  violation, and then any search must be conducted at reasonable a

19  time and in a reasonable manner.

20         The search condition is imposed for two reasons.  One

21  is, you know, if he suspects you're back to dealing or doing

22  something, he can check your phone, see who you've been calling.

23  Or if he suspects you've got a stash in your room and he's got

24  to have a reasonable suspicion, but we're not going to make your

25  agent go get a warrant.  A condition of your supervision is he's

43

1    going to be able to look, and that should provide two things.

2    One is it will assure us that if you go back to this, we're

3    going to know fast, and you're going to be back here, and then

4    we decide whether if I made a mistake how I should correct it.

5        But the other thing is it gives you a stronger

6    incentive to stay away from this because you know your agent has

7    got this authority to search and even check your phone to see

8    who you've been talking to and who you've been calling, so that

9    will give you even a stronger incentive as if you --  Hopefully

10   you won't need one, but it's there.

11       The testing is going to occur of course in terms of

12   out-patient treatment.  I'm going to want the judgment to

13   include a recommendation for treatment in prison.  You're not

14   going to be there for very long.  I'm not sure when they'll

15   transfer you.  But if you're in for any length of time, I'll

16   recommend treatment, but it certainly wouldn't be a full

17   treatment.

18       As I said earlier though, you've been through

19   treatment.  And my sense is that what you really need is back to

20   work, and then you need to resolve to stay away from this stuff.

21   If you keep yourself busy with work and comply with the other

22   requirements here, hopefully you won't have to go to out-patient

23   treatment, but your agent will make that determination.

24       As I said, this is I think sufficient but certainly

25   not greater.  And if anything, it's not great enough, but I'm

1  satisfied from what I heard here today that this sentence makes

2  sense.  I think it offers the best opportunity for you.  It

3  certainly offers and with the larger community would certainly,

4  the Government and Court hopes is that you'll use this -- take

5  advantage of this additional opportunity now to make sure you

6  never put yourself or your family in this position again.  And I

7  hope you leave here with some sense of how you escaped what

8  could have been and in many districts would have been a five

9  year or more sentence.  And this is it.  This is your chance.

10  If you show me by your behavior that this is a mistake, like I

11  said, I will be able and willing to correct it.

12          If there are any other counts are dismissed is there a

13  forfeiture provision, Mr. Roach?

14          MR. ROACH:  No.

15          THE COURT:  You have the right to appeal your

16  conviction or your sentence, Mr. Talamanco.  Your attorney will

17  talk to you about possible grounds to appeal.  If you cannot

18  afford the cost of an appeal, the clerk will assist you so you

19  can file in the form of pauperis, and you don't have to pay

20  those costs.

21          If you choose to appeal, you have to file a notice of

22  appeal within 14 days of the entry of the judgment.  If you fail

23  to file a timely notice of appeal, you would lose that right.

24  Do you understand those things?

25          DEFENDANT:  Yes.

1    THE COURT:  Is there anything I've omitted?  Anything

2    else?

3    MR. ROACH:  No, Your Honor.

4    THE COURT:  All right.  This matter is completed.

5    (Whereupon proceeding was concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, SUSAN ARMBRUSTER, RMR, Official Court Reporter and Transcriptionist for the United States District Court for the Eastern District of Wisconsin, do hereby certify that the foregoing pages are a true and accurate transcription of the audio file provided in the aforementioned matter to the best of my skill and ability.


Signed and Certified August 10, 2020.

/s/Susan Armbruster

Susan Armbruster


Susan Armbruster, RPR, RMR
United States Official Reporter
517 E Wisconsin Ave., Rm 200A,
Milwaukee, WI 53202
Susan_Armbruster@wied.uscourts.gov